23-5890 Lori DeVore v. UK Board of Trustees oral argument 15 minutes per side Mr. Buchert for the appellate. May it please the court. As the court is aware this is a religious discrimination case based on a failure to accommodate. Ms. DeVore was employed as a department academic administration senior in the office for policy studies on violence against women at the University of Kentucky. Ms. DeVore when at the conclusion of COVID and when everything when they were resuming on-campus activities at the University of Kentucky, Ms. DeVore returned to campus from working at home. About a month after she returned to campus the university implemented a COVID policy which required all on-campus faculty, students, and staff to be vaccinated or to submit to weekly testing. Ms. DeVore noted an objection, a religious opposition, to both the vaccine and the testing mandate. Initially Ms. DeVore requested, consistent with her opposition, Ms. DeVore requested a religious exemption to the testing mandate whereby she would be allowed to continue working on campus without submitting to the weekly testing. Had she not, counsel, already requested a non-religious hybrid schedule so that she could work from home? That was a little bit earlier, your honor. That was about a month or so prior, I believe, prior to her requesting a religious opposition. When she requested the accommodation, at the time that she submitted the request for the exemption and then subsequently the accommodation, the university never questioned her religious convictions or her beliefs. In fact, the decision-maker in denying their request for the accommodation was Martha Alexander. Ms. Alexander noted in her deposition that she believed that Ms. DeVore's opposition to the testing mandate was based on a sincerely held religious belief. Therefore, she never questioned the sincerity of her belief or that it was religious in nature. I'm sorry, go ahead, judge. Thank you. Just to be clear, the initial request, which was for the hybrid, I think it was three days in and two days not in, that was not necessarily based on any religious accommodation or certainly it wasn't an exemption. That's correct. That was more so, your honor, based on the fact that the executive director, there were only two employees for the Office for Policy Studies on Violence Against Women. There were only two full-time employees in that department and one part-time employee. That full-time, the other full-time employee was the executive director who was working at home under a medical accommodation. She was suffering a medical condition which prevented her from being able to come in. So because she was working from home, I think Ms. DeVore noted that the lack of necessity to have her in the office, regardless of the religious reasons and that sort of thing, but just for need-based, she requested that she be given that hybrid schedule to work from home. But wasn't she, wasn't part of her job duties to be the face of the office to the public? That's been the university's contention, but that's not in any document you will find in this record. The job description within the record states that she is to have interaction and she is to provide support for the Office for Policy Studies on Violence Against Women, but it says nothing about being the face. It says nothing about being physically present. Wasn't the policy itself throughout the university following the return after COVID was to have people in her position physically present in the office to be the face of that department to the public? I don't know that they ever used that language, but there was, there was a College of Arts and Sciences policy that demanded that all department managers be present. Now, what is important here is that there are 20-something departments in the College of Arts and Sciences. Each of those have different needs and different circumstances. For example, the Office for Policy Studies on Violence Against Women had no faculty, no students. They had stopped on fundraising events, and in her deposition, the executive director, Carol Jordan, could not identify a single individual who had come to campus post-COVID seeking in-person assistance. Contrast that with the chemistry department, who has, and most notably, I presented the operating budget as evidence of this disparity between the needs of these departments within the College of Arts and Sciences. Chemistry department has a $7 million budget in 21-22. Meanwhile, the Office for Policy Studies on Violence Against Women had a $423,000 budget. What this distinction tells you is that all departments are not created equal, and for Martha Alexander to sit back and just rely on a college-wide policy, as if to suggest that everybody's needs are identical, without delving into that and finding out what the true needs of the department are, was how responsible. Yes, and so I'm gonna interrupt you just to maybe try to direct you to the initial question, whether this, whether your clients expressed opposition was religiously based. Yeah, from the onset, as soon as that policy was announced, yes, it was always religious-based after that policy was announced. There was some discussion about a hybrid schedule or working from home. But I'm sorry, I'm sorry, I understand that she claimed that she had a religious objection, but, and I also understand that the case law says that we don't go behind that expression, but there's still objective standards for what is a religious objection and what is simply a policy objection. So what is your best argument that this is a, this should be recognized as a religious objection, as opposed to objecting to the policy? I will defer to document 2220 in the, in the trial record. It is a October 26, 2021 supplemental document that Ms. DeVore submitted in conjunction with her meeting with Martha Alexander regarding the requested accommodation. In that document, Ms. DeVore writes, God wants us to be actively engaged and to be diligent, proving all things, to search out what is true and to do what is right. Next, she writes, God is love, full of mercy and forgiveness, but he is also a God of justice. This combining those brings us to the sort of the final thing that she writes in that same memo. God has given us tools to properly discern what is right and wrong and by the gift of his Holy Spirit to choose to do what is right, because I will be held accountable. These choices are and need to be personal. This, so how is that different? How would you distinguish this to a sincerely held belief that any policy of the employer is wrong? I'm not sure that, what I would say to you is that it is, it's very individualized. You have, you have to look at each individual and Ms. DeVore believes right or wrong, whether we believe it or not, it's not up for us to decide whether she's right or wrong, but she believes that there are spiritual consequences for her actions. And she believes, she, she believes that she cannot submit to a test that she believes is coercive, unethical, invasive, and generally wrong without having to answer to God. This is, how do you, but there, there might be many rules that a university employer imposes. Are you saying that if she sincerely objects, then she, then she's entitled to a religious exemption from all of those rules? It, it sounds to me like in the district court made a similar point when they referenced blanket, a concern about a blanket privilege, religious accommodation being used as a blanket privilege to avoid anything somebody doesn't want to do. What I would argue is that Title VII is not a blanket privilege. It is a conditional privilege, a conditional privilege that allows employees an opportunity to avoid certain obligations, not all obligations, certain obligations that conflict with sincerely held religious beliefs. The protection for the employer in those cases is that it must be sincerely held and the employer must be able to accommodate that without undue hardship. But for us to- Isn't, isn't, I'm, I'm struggling with your argument because let's take, for example, the saliva testing. It seems to me that all of her references, beginning with the October 1 date are, and October 4, are medically based requests for an exemption. And they rely on the nasal testing. Doesn't, I don't find anywhere in the record where she indicates that there is a religious exemption to the saliva test. She references that in the October 26, where she talks about having to be responsible for her choices. This is, and I will, I'll defer to, there was a decision that came out of the Eighth Circuit just last month, and it was Ring Offer versus Mayo Clinic Ambulance. And they talk about- What's the site? It is 2024 U.S. Applexus 12522. And it talks about a personal, even a personal opposition falls within the protections of Title VII, so long as the view is part of a comprehensive religious system. And again, this goes back to my point is this is not like the Geisinger case cited by Appley in the, in their pleadings, where it's just somebody saying, I have a God-given right to make my choices. It goes beyond that. It goes into the consequences that one has to suffer in the eyes of their God if they make irresponsible choices. Let me, let me help. I need your help on understanding how the record supports this. My memory is that this complaint is unverified. Is that correct? I-  That may very well be- There's no affidavit in the record. There's no declaration in the record. And you have not introduced any deposition testimony into the record on her behalf. Is that correct? I believe that is correct, Ron. But what we have are the documents that are part of what was submitted to the university. This is the university that decided, is claiming that these aren't sincere religious beliefs. And the evidence that was submitted to the university demonstrates that it was. Well, I'm struggling with, with what is within the record. Lacking an affidavit, lacking a declaration. What you have is email writings as the basis for her claim. Is that correct? Which are part of the record, yes. And I'm also struggling with where, if we're looking, just the example that comes to my mind is the saliva test. But I'm not finding anything in those writings in which she says that I couldn't take the saliva test as a religious matter. I could not take the saliva test. It's not invasive. Her first claim was it's invasive. Her next claim was it's coercive. But that's, but let's say the option at issue here is the saliva test. Point me in the record to where she makes a religious exemption claim. She doesn't. I will concede she does not expressly reference the saliva test. But what she does is she references participation in any testing. That that would include saliva testing, nasal testing or any other form of testing. On the basis that it's coercive? Yes, I want to make sure I know on the basis on the basis that she will have to explain to God how she blindly submitted to an employer. It's almost a form of idolatry. If you are blindly submitting to this employer and doing whatever they say, on the condition of maintaining your job, and she has a belief that she has an actions on this planet in order for her to be received well in the next life. So if the employer has hours that the employer requires, then she can say I have consulted with my God and he does not authorize me to be there that early in the morning or to stay that late in the evening. Under your argument, our test is that she has an objection to any policy or requirement of employment that her consultation in her faith tells her she shouldn't be doing. And I'm just really struggling with how that could ever function. I appreciate that. And I think that the important point is that she can express that. And it's not to this court to question whether or not that's legitimate. What it is, she can express that. But that doesn't mean that she gets it just because she expresses a religious objection to it. What it does is it then puts the ball back to the university's court to say this will create we cannot allow people to come and go at any hour they feel like, because that would create an undue hardship on our on our work. For in a factory situation, we can't have some people show up at two and some people show up at four and some people show up at six. You can't have when you're working as a team in that way. You can't have people show up in that way. Okay, one final question before we allow your opposing counsel to speak. Under that argument, I want to be sure I'm clear. There is nothing that an employee cannot claim is a religiously protected right. None of the employer's rules are outside a claim for in a real religious exemption or a religious incommendation. Under your theory. That's correct. I think that's the ruling of the court in Fox versus Washington. This very court is that I can't express my view. We just needed a yes or no answer. And you will have your rebuttal time. Thank you. Mr. I'm sorry, Bowman. Yes, Your Honor. Thank you. May it please the court, Mr. Buecher. I think I can help address some of the court's questions about what is on the record. I think this is important because the documentary proof shows not only what was asked, but what was not asked. And I can point the court where these are. So first, it's what's page, page 8461. So this big document 24-1, that is the job description for Mr. Boer. The question earlier was, where does it say that she is to be the public face of the department? I think you can see that through two different documents. One is her job description. And at this page five of her job description, it mentions that she's to manage the daily work workflow, the daily operation, serves the primary advocate for faculty, students and staff and navigating within the college and the administration develop staff through effective coaching on a daily basis, provide reports on page, two pages over from that on page seven of her job description. It talks about her communication skills, and notes the daily communication that occurs in five different segments of folks at the university she would interact with. On the next page of that job description, again talks about interaction with faculty, managers, supervisors, staff, students and other college administrators to provide daily interaction was also mentioned earlier about her request for remote work. This occurred in June of 2021. And the request, I think the best place in this for the record, because you can see the request and the response made on back to back pages is document, I think Mr. Buecher referenced this earlier, document 22-5. Those are page ID numbers in the record at 342 and 343. So at that point is where Ms. DeVore makes her request to work at home two days a week, because the job entails a lot of long hours and stressful. She thinks she'd be more effective working at home, where she would not have so many interruptions and interactions. It also would prevent her from having to walk to her car late at night. Part of what she did was fundraising events. The university's response to that on June 30, again, more than a month or about a month, excuse me, before the testing requirement was put in place. And it notes that a fundamental aspect of her job is to be present in the department and welcome students and visitors, support faculty and answer questions. The offices need to be open, they need to be staffed, this requires a physical presence. And so to the question of where is it in the record that she's to be that public face, these two, three documents show that. As to the religious nature of her objection, as the court knows from the record, there was no vaccine mandate for main campus at the University of Kentucky. What the rule was is that if you weren't vaccinated, for whatever reason you chose not to be vaccinated, then you had to test on a weekly basis. When Ms. DeVore first objected to the testing that was provided on campus, which was the nasal swab, which was invasive, the reaction to that was there are other tests available, including the saliva test where you spit into a straw or like a funnel that goes into that. When Ms. DeVore responded to that, and that's the October 26, 2021 memo that my colleague mentioned in the record at 22-20. On the Ms. DeVore three page, a little over three page single space memo, she gives some of the background of her employment history, as well as her job duties. But then as we get on to the final page, she specifically addressed the mandatory testing and why it's an affront to many of my convictions. She numerically lists four items at the top of page 398 in the record. The first one is that repeated testing may damage the first line of defense that God has created for us. Second, that mandatory testing interferes with her right to choose what she will and will not do. The third item that she mentions that she believes she's being manipulated into taking the vaccine. And then fourth, in my opinion, doesn't address an objection. It's a statement I think we all would agree with, that God is love, full of mercy and forgiveness, and he's the God of justice. So the point of that in that memo, which she already knew about the testing options, was that she never identified what her sincerely held religious belief was and how that conflicted with the testing, particularly the oral testing. And so in response to that October 26 memo, Ms. Alexander writes Ms. DeVore again noting that she doesn't have to do the nasal swab. She can do the saliva, which is eating a spittle in the cup. That is in the record at 22-22 on November the 2nd. On In the middle paragraph there, I think is the most important thing where she says your proposed reasonable alternative is not sufficient. You do provide an alternative means of testing, but that doesn't address all the points that I raised. And as you read these documents, you just see there's never an identification of a religious objection to the testing, particularly the saliva spitting in the straw, spitting in the cup. What about Mr. Buecher's argument that her blindly submitting to a test is a form of idolatry? I get that that's not, that wasn't articulated in any way in the record, at least not by her, but I'm taking that as his reasonable kind of representation of what was meant when she says things like this is an insult to God. In terms of that, she held a religious belief that no testing at all would have been appropriate. Again, that was never anything that the university had the opportunity to respond to. That's never what she said. And when she did have that opportunity to say that, she pivoted back to, well, you're trying to coerce me into getting the vaccine. Well, that's not an option. Those two items did not align up. But even at that, Your Honors, I know we haven't had time to address this today. There's another very important part of the court's opinion, which is the undue burden. And of course, we get all this fully briefed for summary judgment. We knew Groff was coming. It drops and then you, Speaker, and I have to go back and write briefs. But, you know, our position in that was it didn't really change anything. And if we look at what the Supreme Court says in Groff is that Hardeman's still the law. We've clarified that it's not just a de minimis. But I think what's really interesting is as we go back and look at Hardeman, it's important because in that situation, an employee had a religious objection to work a particular day of the week. And that's certainly a common occurrence that many employers face throughout the country. TWA in that situation had a seniority line in terms of who could cover which shift. And I think there's a big difference in shift swapping versus what Ms. DeVore was asking for, which would have literally been job swapping. But I think it's important to remember in TWA, Mr. Hardeman lost because the court said for TWA, a company that would have been that big in the early 1970s, that it would have been an undue hardship for them to have to have broken their seniority system. Or realistically, as Ms. DeVore asked here, hired a new employee to do her job. Counsel, if you look at the explanations in the record and the inquiry that was made about accommodation, I mean, it does seem that it wasn't a particularized inquiry. There was reference to the policy that Hartman says have to be there. And this notion of being the public face, but there was no consideration of the fact that this wasn't a normal department and that people weren't coming into the office. So it sort of undermines the conclusion that it was an unreasonable accommodation. So it's a small office. There are two full-time employees and one part-time employee. I'm not sure where the record establishes that no one was coming into the office going forward because Ms. DeVore was not present. She was not coming in after the request for remote work was denied and she was not doing the testing. So at the time she leaves the university, they actually don't have a hiring freeze. They don't fill that. I'm sorry. I thought that she was showing up without complying with the policy. No, no. Yes, you're on. It's true. But it's not established that no one was coming in. I mean, they were still trying to function as they were. And that's what her role was, was to be there, was to interact with the people who were coming in. Is your position that this case should be resolved at the undue burden stage, or is your position that this is not a request for a religious accommodation? It's both, Your Honor. I think we have to go through both steps. I think as I believe we've laid out in our brief and the facts demonstrate, this was not a religious belief, ultimately, certainly to the accommodation that was offered to her for the oral saliva testing. But second still, it is an undue burden on the university to have an employee remain fully employed, fully on the payroll, but not able to come into work and do their critical aspects of the job. And meanwhile, the university is going to have to mandatorily move someone over, which we know there's no requirement to do that and the impact that or what really was the proposal here by Ms. DeVore, just hire another employee, hire two people to do one job. And so I think it's... The Supreme Court is pretty clear about saying that we are not in a position to question somebody's religious beliefs or faith. I'm struggling a little bit at this stage on this particular record with how it qualifies as a religious exemption. So tell me what is your most parallel case that you would rely on in that context? And also, are there facts that you think we have not discussed that indicate that it is not a religious request, but is more in the... I think it's else, isn't it? Mere moral code. Yeah. And I think she, to that point about the moral issue, that is exactly what, in part, that Ms. DeVore cites too, is that it's moral and ethical objections that she has to the testing. So I think there's a number of district court cases that we cited. There are district court cases, but that we cited as two specific examples of similar policies where an unvaccinated employee was required to test. There's the Eagle Crop case, I'll pronounce it Eagle Crop case, out of the District of Wisconsin that is cited in our brief. Jackson versus Methodist Health Services, which is a central district of Illinois case from earlier last year about the weekly testing requirement. And that was about her objection or that employee's objection also to the vaccine as well. The district court also relies on a case styled Fink-Finer versus Geisinger Clinic from the Middle District of Pennsylvania. That is actually a published case. It's 623 F Third, excuse me, F Sup Third, 458. So those are three similar cases that we have where you have employees in post-COVID dealing with vaccine versus testing and religious objections to that. I thank you all for your time. And if there are no further questions, I will stand down. Thank you. Rebuttal time. Thank you, Your Honor. I just want to point to, there seems to be some question about whether or not misdivorced beliefs are religious in nature and whether or not they're even sincerely held, even though that was not a ruling at the district court level. We never addressed the sincerity of her beliefs. But I will defer to Kent versus Johnson, a 1987 opinion by this court, in which they acknowledge that the question of whether or not something is religious within a person's own scheme of things is factual in nature. That, therefore, this is not a case that is appropriate for summary judgment because that is a question of fact. And therefore, I think that that's why this needs to be presented to a jury. I do want to also shift gears and address the undue burden argument, since I didn't really get an opportunity to get there initially. And what is the most glaring piece of evidence about that whole argument, that it would have been unduly burdensome, is the fact that the university claims that it was critical that someone be present within the Office for Policy Studies on Violence Against Women to greet potential visitors. After Ms. DeVore was placed on administrative leave on December 4th of 2021, until that department shut down over 18 months later, they put no one in that position. This is a university with a $5 billion budget. If this was a critical need for the university and would have been an undue hardship for the university to leave that position vacant, they could have found money somewhere, pennies, compared to that, but relative to the overall budget, to fill that need. I guess, help me with that. I understand that that's, I think that it is the larger entity that we're looking to. I don't dispute that. I think that's the newest law in that it's not just your department's budget. But I'm struggling with the idea that the religious right is shown and the undue burden is by the failure of the university to have replaced her. I'm wondering if that doesn't cut both ways that she was supposed to be there doing the job and left. And then it turned out that her role was important enough that in the end, the department could not without that. And so they closed the whole thing down. I'm struggling with what reading you take from the fact that this entity could not continue without her presence there as well. No, no, no, no, no. That's a misunderstanding. The entity shut down. Where in the record have you made that by sworn or other? In Ms. Jordan's deposition, Your Honor, and I can't point to a page, but Ms. Jordan, the department shut down. It had nothing to do with Ms. DeVore. There's no evidence that that was because Ms. DeVore was no longer in the office. That's not why that office shut down. It shut down because, A, there were only two employees and one of them had brain cancer. The executive director had brain cancer. And where in the record is admissible proof of that? And I can't point you to a page, and I apologize, but it is in Ms. Jordan's deposition. And is Ms. Jordan's deposition, did you make that a part of the record? It is a part of the record. Did you enter that deposition into the record? I did. It was referenced in my brief in response to, in support of my motion for summary judgment. And not referenced in your brief? Not referenced. I mean, it's an exhibit. The record. Yes, the full transcript is in the record as an exhibit to my response, or to my motion for summary judgment. Yes. All right. Are there other questions? I'm happy to answer questions you'll have later. We thank you both, and we thank you for rescheduling so we could all be together and talk about this. The case will be taken under advisement and an opinion issued in due course because you're the only argument for today. You may adjourn court. The Honorable Court is now adjourned. Thank you. Thank you, Your Honors.